NOT DESIGNATED FOR PUBLICATION

No. 117,585

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
A.E., K.E., H.E., and T.E.,
Minor Children.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL judge. Opinion filed November 22, 2017. Affirmed.

*James T. Yoakum*, of Kansas City, for appellant.

*Crystal Elaine Ellison*, assistant district attorney, and *Mark A. Dupree*, *Sr.*, district attorney, for appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

PER CURIAM:  Father appeals the district court's termination of his parental rights to A.E., K.E., H.E., and T.E. He argues the court lacked clear and convincing evidence of his unfitness and that it is not in the best interests of the children to terminate his rights. However, Father's lack of effort to comply with court orders in place for 14 months supports the district court's decision. We affirm.

Father and Mother have four children together—A.E., K.E., H.E., and T.E. Mother also has a son, K.R.S., from a different relationship. The parental rights of Mother and the natural father of K.R.S. were terminated on March 23, 2017. Mother's parental rights to A.E., K.E., H.E., and T.E. were also terminated on that date.

Police made contact with the family at a CVS store in December 2015. Police learned that the children were living in a home without utilities, witnessing domestic violence, and witnessing Father physically abusing K.R.S. The police took the children into protective custody.

A social work specialist interviewed the children. She learned that A.E. and K.E. had run away from home because Father was physically abusing K.R.S. The children said that Father would hit and choke K.R.S. K.R.S. reported that the prior week he stayed home from school for two days due to bruises on his face. The children reported that Father also hit Mother and that witnessing the violence made them feel afraid.

The social worker learned that the children had been living without utilities for about a month. The children also reported witnessing Father use drugs, which they described as "'white stuff wrapped in foil.'" They said they could tell when Father used drugs because he acted differently. The children said that they ate fast food with money that their parents got by selling clothes and other items they had "purchased" and sold for less money. In a prior contact with Kansas Department for Children and Families (DCF), officials discovered that Mother used the children as lookouts to enable her to steal from stores.

The family had a long history with DCF. In 2012, the children were placed in DCF custody because they had been living in a van with Mother. They were referred for family preservation services and reintegrated with Mother the following year. A report was filed in 2014 for physical abuse and lack of supervision. While the children were being processed into a Juvenile Intake and Assessment Center (JIAC), they told officials that their parents hit them with belts and hangars. DCF officials investigated Father for physical abuse of K.R.S., but found the claims were unsubstantiated. In April 2015, a report was filed because Father failed to take K.R.S. to a dentist appointment to fix an abscessed tooth. In May 2015, K.R.S. ran away from home and was brought to JIAC. This resulted in the family again being referred for family preservation services. Two

months later, another report was filed for physical and mental/emotional abuse. The report stated that Father struck A.E. and left a red mark on her face that was still visible two days later. All of the children reported that Father hit them. The children also reported that they witnessed episodes of domestic violence.

At some point, Father obtained a protection from abuse (PFA) order against Mother. Despite the order, Father allowed Mother to live in the home with him and the children. Father also allowed Mother's mother, who is a registered sex offender, to live in the home. When the family was referred for preservation services in 2015, Father chose to enforce the PFA order. Police arrested Mother and removed her from the home. When officials discovered that a registered sex offender lived in the home, DCF and KVC paid the deposit and first month's rent for Father to get his own home. When the family moved into the new home, Father chose to let Mother live with them again. By December 2015, however, the KVC social worker assigned to the family reported that he had been unable to contact the family for over a month despite a number of attempts.

The State filed petitions alleging that K.R.S., A.E., K.E., H.E., and T.E. were children in need of care (CINC) on December 23, 2015. The statutory basis for the petitions was K.S.A. 2015 Supp. 38-2202(d)(1)-(3), which provides that a child is a child in need of care if the child (1) is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian; (2) is without the care or control necessary for the child's physical, mental or emotional health; and (3) has been physically, mentally or emotionally abused or neglected or sexually abused.

Father stipulated that the children were children in need of care in February 2016. The district court ordered Father to do a number of things: maintain stable, appropriate housing; maintain stable income; contact the case services officer at least once a month; complete a psychosocial assessment; submit random, negative urine tests; complete

3

assessments for substance abuse, mental health, and domestic violence; attend parenting education classes, and obtain mental health service and medication management.

In November 2016, the State filed a motion for termination of parental rights. The motion stated that Father had been dilatory in fulfilling the court's reintegration orders. He had not scheduled any of the recommended assessments. He failed to submit UAs on five occasions, and the one occasion he did submit a UA it was positive for cocaine. He also had not obtained housing or employment. While Father frequently brought brand name gifts for his children to visits, he never provided documentation of employment. Father also lacked reliable transportation. He missed every appointment scheduled with KVC besides most visits with his children. Although Father was "consistent and appropriate in visits with [his] children" he had made "no progress and no true effort . . . beyond attending visits." Father's troubled relationship with Mother also continued. They would break up, but "always end up back together." Father and Mother had both been hospitalized before. Although the reasons were unknown, the State noted that the hospitalizations usually occurred when one of them decided to break off the relationship. The motion stated that Father's failure to obtain assistance was concerning because if the children were to come home Father might not have the basic necessities, housing, income, and transportation to meet their needs. KVC and the case services officer requested termination of parental rights.

Court services officer Kristen Gardner, Anne Kwon from KVC, and Father testified at the termination hearing. It was Gardner's job to monitor Father's compliance with court orders throughout the pendency of the case. Father did not contact Gardner on a monthly basis as he was directed to do. She only met him on two occasions between February 2016 and the termination hearing. Father also failed to provide proof of housing and income to Gardner until the day of the termination hearing. Father never provided Gardner with documentation that he had obtained the necessary assessments. However, KVC provided Gardner with documentation that Father may have completed a domestic violence assessment in the week prior to the termination hearing. Father did attend

4

parenting education classes. Gardner also reported trouble in getting Father to submit a UA. She attempted to obtain a UA on nine different occasions between May 2016 and January 2017. Father either cancelled appointments or just did not show up. Father also failed to give UAs on occasions when he was in jail, in the hospital, or out of town. Finally, Father missed 10 of his 54 scheduled visits with his children, and was late for another 14 visits.

Gardner never advanced Father's supervised visits with the children to unsupervised visits. Her reason was Father's "[n]on-completion and compliance with court orders, and inconsistency with coming to visits or showing up late." She did not think Father took advantage of the services designed to help with reintegration. She felt as though he had not "made any progress, with the exception of maybe the last two weeks when it came down to actually showing up for [the] termination hearing." She was concerned about Father's "[s]tability, consistency, and ability to maintain his own mental health while maintaining the children's mental health."

Anne Kwon, a permanency case manager at KVC, testified her job was to work towards reintegration of parents with their children. Kwon tried to talk with Father on a monthly basis about completing the court orders, but they did not meet every month. Father canceled appointments or simply failed to show up without providing a reason. The court had not ordered Father to meet with Kwon every month, but it was something KVC required parents to do. The purpose of meeting with the parents was to help them get services in place.

Kwon testified that to her knowledge Father did not complete a psychosocial evaluation, never provided her with verification of stable income, and never completed a mental health assessment. She verified that Father did complete a substance abuse assessment, and that it resulted in no recommendations beyond a suggestion that Father attend NA or AA meetings. She also verified that Father completed a domestic violence assessment the day before the termination hearing. Finally, Kwon verified that Father

5

attended parenting classes in December 2016. Kwon also asked father to submit to UAs. He was unable to urinate on two occasions, tested positive for cocaine on one occasion, tested negative for illicit substances on one occasion, and was unable to submit to a test on one occasion because he was at work.

Kwon was concerned that Father would not be able to address the children's mental health needs. Kwon testified that all of the children required ongoing therapy. She thought Father would struggle to take them to scheduled appointments as he did not have a valid driver's license or stable transportation. She did not think that Father had taken advantage of the State's reintegration services. She thought he made "a lot of progress with natural mother out of the picture." But, he also waited until the "very last minutes" to complete some of the assessments and provide documentation of the court-ordered tasks.

Father testified that he tried to get a domestic violence assessment but that "the people couldn't do it unless [he] had been charged with something." Later, however, he testified he had a domestic violence assessment the day before the termination hearing. He also testified he had an appointment for a mental health assessment the day before the termination hearing. When asked why he waited so long to get the assessments, he said he could not miss work to complete them. He also said that "some of it's just procrastinating too, which was completely my fault." Father's mother and two sisters lived in town, and he thought that he would be able to rely on them for support and transportation.

The district court issued its ruling from the bench. The judge was concerned with Father's apathy towards the children, stating:

> "It's this Court's opinion that any parent who visits their kid on a regular basis can't help but understand that they are languishing in the care of people who are not their parents; that if I make sure that they show up for their visits every week, that they are

6

confronted weekly with these children and their need for permanency and their desire to be parented by their parents."

The court noted that Father visited the children a few times every month after they came into custody in December 2015. However, instead of doing anything that would help get the children out of foster care, Father did nothing until he began parenting classes in September 2016. Father was in jail for theft in October, so he did not work towards accomplishing the court's orders in that time period. Father continued to do nothing until February 2017, when he received notice that his parental rights were being terminated. The court did not like Father's excuse that Father had procrastinated:  "Having your kids sit in foster care for a year while you don't do anything about it is not procrastination. That is neglect of children."

The district court was also concerned about Father's lack of progress towards addressing the issues that caused the initial CINC determination. Father did not contest the determination, which was premised on the fact that he was physically violent with Mother and the children and that he used drugs in front of the children. The court also noted that while Father claimed he had been working through the pendency of the case, he had not presented proof of employment until the termination hearing. The court questioned where the money from Father's employment went, as Father did not pay rent and he did not have a car. The court also questioned whether Father provided proof of stable housing. Father presented a lease that became effective on the day of the termination hearing. Before that, he had been staying with friends. The mere fact that Father obtained a lease did not convince the court that Father's housing situation was stable, as Father had not provided evidence that he could sustain his living situation.

The district court found that Father was unfit by reason of conduct or condition which rendered him unable to care properly for his children and that the conduct or condition was unlikely to change in the foreseeable future under K.S.A. 2016 Supp. 38-2269(b)(7) ("failure of reasonable efforts made by appropriate public or private agencies

7

to rehabilitate the family"); K.S.A. 2016 Supp. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"); and K.S.A. 2016 Supp. 38-2269(c)(3) ("failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home"). The court also found it would be in the best interests of the children to terminate Father's parental rights. Based on those findings, the district court terminated Father's parental rights.

Father appeals.

If a child has been adjudicated to be a child in need of care, parental rights may be terminated "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2016 Supp. 38-2269(a). The court shall consider, but is not limited to, several factors listed in K.S.A. 2016 Supp. 38-2269(b) and (c). A finding of "any one of the . . . factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2016 Supp. 38-2269(f). If the district court "makes a finding of unfitness, the court shall consider whether termination of parental rights . . . is in the best interests of the child." K.S.A. 2016 Supp. 38-2269(g)(1). In making this determination, the court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2016 Supp. 38-2269(g)(1).

When reviewing a district court's decision to terminate parental rights, the appellate court considers "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, i.e., by clear and convincing evidence, that [the parent's rights should be terminated]." *In re B.D.-Y*, 286 Kan. 686, 705, 187 P.3d 594 (2008). "Clear and convincing evidence" requires the factfinder to believe "that the truth of the facts asserted is highly probable." 286 Kan. at 697. The appellate court does "not weigh conflicting

8

evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705.

Father argues the district court erred when it found that he was unfit to properly care for his children. He contends the "evidence showed that he had no need for continuing drug, domestic-violence, mental-health, psychosocial court support services once the assessments were done." The termination of his parental rights was based solely on the court's unacceptable basis of his taking too long to adjust his life circumstances during the case. Father's contention that he had no need for services regarding drug use, domestic violence, or mental health services is not borne out by the evidence.

In the 14 months preceding the termination hearing, Father only submitted one negative drug test. Gardner tried to get Father to submit a UA on nine different occasions, and she was unsuccessful each time. Kwon asked Father to submit a UA on five different occasions—he submitted one positive test (for cocaine), one negative test, and did not complete the other three UAs. Father did complete a substance abuse assessment in November 2016. While he was not recommended for inpatient or outpatient treatment, it was recommended that he attend NA or AA meetings. One of the things the children reported before the CINC determination was made was that Father used drugs in front of them. Submitting one negative UA and completing a substance abuse assessment without adhering to the recommendations resulting from that assessment do not show that Father addressed his drug use issues. If Father had complied with the court-ordered drug tests, and had tested negative, then his case would be stronger. But, his failure to submit to these tests weakens his argument that he had addressed his drug use issues.

Father also cites the fact that he completed a domestic violence assessment as evidence that he does not need further services before being reintegrated with his children. However, he did not complete the assessment until the week prior to the termination hearing. Furthermore, Father did not present any evidence that the assessment concluded that he did not need services to address domestic violence. As the

9

district court noted the assessment was just the starting point for addressing the domestic violence issues that contributed to the children being adjudicated CINC.

Finally, Father contends that he does not need any mental health services because he completed a mental health assessment. Like the domestic violence assessment, however, Father only completed this assessment the day before the termination hearing. He did not present any evidence that the assessment concluded he did not have any outstanding mental health issues to address.

The overarching problem with Father's fitness to parent is due to his failure to work towards completing the district court's orders. He only met with his case services officer two times, when he was ordered to meet with her a minimum of one time per month. He only submitted one negative UA. He provided evidence of housing on the day of the termination hearing and testified that he had been working at a pizza place in the month preceding the hearing. However, obtaining a lease alone does not show that Father was able to maintain stable, appropriate housing as ordered by the court. Similarly, merely obtaining a job and keeping it for a month is not compelling evidence that Father could maintain stable income. In fact, Father testified he had switched jobs a few times during the pendency of the case. This suggested that his income was not yet stable. Additionally, as stated above, while Father obtained the required mental health and domestic violence assessments, he did not address any of the problems that necessitated the assessments in the first place.

To Father's credit, he did complete parenting classes and he interacted appropriately with his children. However, he missed 10 of 54 scheduled visits with his children and was late to another 14. If Father cannot even keep appointments to visit his children, it calls into question his ability to get the five children to places that they need to go, such as school, doctor's visits, and mental health counseling.

Father contends the district court's decision to terminate his parental rights on the basis that he did not timely comply with court orders is "unacceptable". But, this court has previously affirmed district court decisions terminating parental rights in cases similar to Father's. For example, in *In re D.D.M.*, No. 101,673, 2009 WL 1692524 (Kan. App. 2009) (unpublished opinion), a mother's parental rights were terminated after she failed to fully comply with the court-ordered plan. She had a history of moving from place to place living with friends. She also moved from job to job despite the court ordered goal that she obtain and maintain employment. The record showed that mother continued to use and abuse alcohol. Finally, although she was ordered to complete training, evaluations, and therapy, "[h]er progress towards completing th[ose] orders appear[ed] to have only taken place in the weeks immediately preceding the termination hearings." 2009 WL 1692524, at *1. *D.D.M.* is similar to Father's case because he also failed to obtain stable employment and housing, only submitted one negative drug test, and made most of his progress on the court-ordered tasks in the week leading up to the termination hearing.

*In re T.W.*, No. 98,539, 2008 WL 360724 (Kan. App. 2008) (unpublished opinion) presents another analogous situation. There, mother appealed the termination of her parental rights. She was ordered to do many of the same things as Father—meet with a court services officer once a month, obtain and maintain stable income and housing, complete a psychosocial evaluation, obtain a drug assessment, submit negative UA's, and attend parenting classes. On appeal, she argued that the decision "to terminate her parental rights was based on insufficient evidence because she had either complied with or was working on complying with all of the district court's orders." 2008 WL 360724, at *3. She cited the fact that she signed all releases of information, attended some visitation with her children, improved her behavior around her children, kept in contact with her case services officer, maintained stable income and housing, completed psychosocial and drug assessments, submitted to drug tests (even if they were positive), and took parenting classes. The *T.W.* court, however, affirmed the district court's decision and held that although mother had complied with some orders, "she fail[ed] to acknowledge her

11

excessive drug use and her lackluster manner in completing the court's orders." 2008 WL 360724, at \*3. Here, Father has also only halfheartedly complied with the court's orders. He also failed to acknowledge or address the domestic violence and drug use issues that contributed to the children's CINC determination. See also *In re J.S.*, No. 90,798, 2004 WL 324427, at \*4 (Kan. App. 2004) (unpublished opinion) (affirming termination of parental rights because, although parents maintained regular, appropriate visitation with children and attended parenting classes, they failed to address an underlying substance abuse problem).

In *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982), the court held that "continued unfitness can be judicially predicted from a parent's past history." While it is possible that Father could successfully complete all of the court's orders if the termination is reversed, his past conduct does not provide any evidence that this will actually happen. The evidence shows that Father failed to make any significant progress in completing the court orders and that he has not addressed the issues that led to the initial CINC determination. The evidence, when viewed in the light most favorable to the State, shows clear and convincing evidence that Father was unfit and that his unfitness was unlikely to change in the foreseeable future.

Father also argues that termination is not in the best interests of the children. He suggests that the district court should have instead transitioned the children into supervised visits at Father's home while he continued working on the "Sisyphean list" of court orders.

We review a district court's decision regarding the best interests of the child for abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). Judicial discretion is abused if the judicial decision (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

The list of court orders was not "Sisyphean" as Father complains. The fact that Father was able to provide proof of housing and obtain mental health and domestic violence assessments in the week prior to the termination hearing shows that Father might have completed the tasks if he had applied himself earlier in the process. It also should not have been difficult for Father to meet with his case services officer once per month. Father's apparent inability to attend a single monthly meeting calls into question his ability to provide for the ongoing, daily needs of five children. The district court considered Father's actions in determining whether it would be in the children's best interests to terminate Father's parental rights. The court said that the children needed permanency and that Father was either "unwilling or unable to do it in any kind of meaningful time for the kids." The court did not feel it could not make the children wait another year to allow Father to complete the court orders, especially given that Father had an opportunity to complete the court orders and declined to do so for over a year.

Father cites no legal authority to support his argument. And, he does not allege that the district court made an error of law or fact. Father's failure to timely comply with court orders or to make efforts to be reunited with his children indicates that the district court's decision was not unreasonable, fanciful, or arbitrary. The district court was not required to allow Father supervised visits at his home. Furthermore, the district court had no evidence that the home was suitable for children, that Father had the financial stability to maintain the home, or that Father would be able to keep appointments. Thus, the district court did not abuse its discretion.

Affirmed.

13